Roger M. STOWE, Petitioner-Appellant,

v.

Frank E. DEVOY, United States Marshal, Respondent-Appellee.

No. 273, Docket 78–2085.

United States Court of Appeals, Second Circuit.

Argued Sept. 22, 1978.

Decided Nov. 17, 1978.

Gerald B. Lefcourt, New York City, for petitioner-appellant.

Herbert G. Johnson, Asst. U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (David G. Trager, U. S. Atty., E. D. N. Y. and Harvey M. Stone, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for respondent-appellee.

Before MOORE and VAN GRAAFEI-LAND, Circuit Judges, and KNAPP,* District Judge.

MOORE, Circuit Judge:

Roger M. Stowe ("Stowe"), appeals from a final judgment of Judge Jack B. Weinstein for the Eastern District of New York, dismissing his petition for a writ of habeas corpus seeking his release from the control of the appellee United States Marshal and barring his extradition to Canada. Stowe is sought for extradition by the Canadian Government on charges of both conspiracy to import and importation of five and one-half pounds of hashish. Stowe contends here that (1) his extradition is barred under a "double jeopardy" provision of the appli-

* Honorable Whitman Knapp, United States District Judge for the Southern District of New York, sitting by designation.

cable treaty between the United States and Canada;[1] (2) evidence derived from wiretaps made by Canadian authorities should have been excluded at the extradition hearing below; and (3) the extraditing magistrate abused his discretion in ordering extradition. For reasons set forth below, we affirm.

## I.

During the period from January 8, 1975 to May 14, 1976, Canadian law enforcement officials intercepted by means of a wiretap in Canada, telephone conversations of Francois Joseph Alario made from and to his residence in that country. Stowe was in New York during this period. These conversations revealed a conspiracy (including Stowe, Alario, Stanley, Wesolowsky and others) to smuggle hashish from the United States into Canada. On April 13, 1976, surveillance of Wesolowsky was undertaken (presumably by officers of the New York State Police and agents of the United States Drug Enforcement Administration ("DEA")) during a trip by Wesolowsky from Montreal to Albany, New York, where he was observed receiving a package from Stowe. Upon Wesolowsky's return to Canada he was arrested by members of the Montreal Drug Squad of the Royal Canadian Mounted Police. A search incident to that arrest revealed a package containing approximately five pounds of hashish in a rear wheel well of Wesolowsky's vehicle. Three fingerprints found on bags and on pages of newspaper used to wrap the subject hashish were subsequently identified as Stowe's.

On April 14, 1976, upon Stowe's entering Canada from the United States, he was arrested and charged in the Superior Court for the District of Montreal with conspiracy to import and importation of 5½ pounds of hashish into Canada, in violation of Section 423(1)(d) of the Criminal Code of Canada and Section 5(1) of the Narcotic Control Act of Canada, respectively.[2] Stowe was released on bail and granted permission to return to New York on express condition that he return to Canada for trial on January 6, 1977. He failed to do so.

Stowe was subsequently indicted by the State of New York for felonious possession and sale of 100 pounds of hashish, an offense alleged to have occurred while he was on bail pending trial of the Canadian charges.[3] On March 4, 1977, pursuant to a plea bargain, Stowe pleaded guilty to criminal possession of a controlled substance in the seventh degree, a Class A misdemeanor, N.Y. Penal Law § 220.05 (McKinney Supp. 1977). On December 15, 1977, Stowe was sentenced on that plea by the Honorable Michael J. Dontzin, New York Supreme Court Justice, New York County, to a fine of $1,000, without imposition of a jail sentence or any period of probation.

On October 27, 1977, United States Magistrate A. Simon Chrein signed and issued a warrant for Stowe's arrest upon the complaint of the United States Attorney for the Eastern District of New York. The complaint, brought under 18 U.S.C. § 3184, alleged that the Canadian government had duly made requisition for Stowe's extradition under the Treaty.[4] Stowe was brought

1. The Treaty on Extradition Between the United States and Canada of 1971, effective March 22, 1976. [1976] 27 U.S.T. 983, T.I.A.S. No. 8237 [hereinafter the "Treaty"].

2. Section 5(2) of the Narcotic Control Act of Canada provides that violation of Section 5(1) of that Act is punishable by a term of up to life imprisonment, but not less than seven years. Can.Rev.Stat. c. N–1 § 5(2) (1960–61). Under Section 423(1)(d) of the Criminal Code of Canada, the general crime of conspiracy is punishable by the same sentence as the substantive offense charged. Can.Rev.Stat. c. 51 § 423(1)(d) (1953–54). Under the laws of Canada, the courts of that country have jurisdic-

tion over all members of a criminal conspiracy if one of the members thereof commits an overt act within Canada.

3. There was no suggestion in the proceedings below that the crime (or the hashish) which was the subject of the New York State prosecution was in any way related to or a part of the crimes (or the hashish) which were the basis of the charges pending against Stowe in Canada.

4. Copies of duly sworn and certified extradition papers were attached to and incorporated in the complaint. Although Stowe did object to

before Magistrate Chrein on November 2, 1977, at which time he was released on bail. At the request of defense counsel, Justice Dontzin sent a letter to Magistrate Chrein in which he stated that he had "considered" the Canadian charges in sentencing Stowe.[5] On January 30, 1978, Magistrate Chrein issued a written decision and order certifying Stowe as extraditable.

On March 23, 1978, Stowe filed the habeas corpus petition which is the subject of the instant appeal. On July 10, 1978, Judge Jack B. Weinstein issued a written order denying the petition but continuing bail and staying Stowe's surrender in order for Stowe to have an opportunity to appeal. On August 15, 1978, this court granted Stowe's motion for a stay of surrender pending appeal and then set down this appeal for expedited argument.

## II.

■ The primary issue raised by this appeal is whether the "double jeopardy" clause of the Treaty, Article 4(1)(i), bars Stowe's extradition. That clause prohibits extradition when the person whose surrender is sought "has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested". In the instant case, the offense for which Stowe alleges he was "tried and discharged or

punished" as part of his plea bargain before Justice Dontzin was not the same "offense for which extradition is requested". *See* Treaty § 4(1)(i); *In re Ryan,* 360 F.Supp. 270, 275 (E.D.N.Y.), *aff'd mem.,* 478 F.2d 1397 (2d Cir. 1973). The charges pending in Canada are importation of hashish and conspiracy to import hashish; the charges against Stowe in New York State were possession and sale of hashish (later reduced to possession of a controlled substance in the seventh degree). More importantly, the charges in the state case concerned 100 pounds of hashish which were completely separate from and unrelated to the 5½ pounds of hashish which were the subject of the Canadian arrest.[6] However, relying upon this court's recent decision in *Galanis v. Pallanck,* 568 F.2d 234 (2d Cir. 1977), appellant claims that when Justice Dontzin sentenced him pursuant to his plea bargain in his subsequent prosecution in New York State Supreme Court, the Canadian charges were taken into "consideration", thereby satisfying the requirements of Article 4(1)(i).

The difficulty with defendant's position is that the *Galanis* decision has no application to the matter now before us. In that case, we did not purport to construe the "double jeopardy clause" in Article 4(1)(i). On the contrary, it was common ground between the parties that the clause would—if appli-

---

the introduction of certain of these documents into evidence at the extradition hearing on the ground that information therein was the product of the interception in Canada of telephone conversations, which allegedly was unconstitutional under the laws of the United States, Stowe did not there (nor does he here) attack either the authenticity of those documents or the accuracy of the facts set forth therein.

5. The pertinent language is as follows:
   "While those charges in Canada were not before me, I did consider those charges as part of the plea bargain arrangement and the sentence that was imposed.
   [Defense counsel] submitted to me a copy of the minutes of the sentencing of Roger Stowe before me on December 15, 1977, and has asked me to comment on an interpretation he represented to me of those minutes given by an Assistant United States Attorney, to the effect that the sentence that I imposed was lenient because I was under the impression

that he would be punished additionally by Canadian authorities. This was not the case. My sentence was imposed because of the view with which the courts and in particular, myself, have come to view marijuana offenses and because of the particular background of the defendant before me, his role in the crimes charged, and my knowledge and consideration of the charges against the defendant pending in Canada."
   Letter from Justice Michael J. Dontzin to Magistrate A. Simon Chrein (January 9, 1978).

6. That these are different offenses is clear under any of the commonly accepted tests used to define the "same offense" in determining whether a second prosecution is barred as subjecting a defendant to double jeopardy. *See, e. g.,* Note, *Twice in Jeopardy,* 75 Yale L.J. 262, 267–77 (1965); *United States v. Feinberg,* 383 F.2d 60, 71 (2d Cir. 1967).

cable at all—prevent the extradition there being attempted. The only question litigated was whether the present Treaty or its predecessor, Article X of the Webster-Ashburton Treaty of 1842 (which did not contain the "double jeopardy" language of Article 4(1)(i)) governed.[7] In holding that the present Treaty controlled, the court found it unnecessary to interpret the double jeopardy provision or to determine what persons fall within the ambit of its protection.

■ As we have noted, the protection of Article 4(1)(i) extends only to those persons who have been previously "tried and discharged or punished" for the extraditing offense. Defendant argues that the Article sets forth two alternative requirements; and that extradition is barred if the fugitive has been *either* "tried and discharged" *or* if he has been "punished". Thus, he claims that the Treaty elevates the concept of prior punishment to a level of great importance. However, as probation reports customarily list all of defendant's past indiscretions, there would almost always be a factual basis for a contention that the defendant had been "punished" for the extraditable offense. To read the provision so broadly does violence not only to its language but to the reason and intent of the Treaty by giving any court the power to subvert the extradition agreement. The Article does not apply unless two distinct requirements are satisfied: (1) the fugitive must have been "tried" for the offense in question, *and* (2) the trial must have resulted in discharge or punishment. In other words, "discharged" and "punished" are corollaries, each of which modifies "tried".

This interpretation is consistent with the purpose of Article 4(1)(i). The "double jeopardy" provision of extradition treaties is intended to "prevent extradition of Americans actually in the process of trial or who have been tried". Statement by Mrs. Hauser before the Special Subcommittee on the Genocide Convention of the Senate Committee on Foreign Relations (April 24, 1970), *reprinted* in 63 Dep't State Bull. 9 (July 9, 1970).

■ Applying these considerations to the instant case, the state judge's "consideration" of charges not before the court did not fulfill the necessary requirements for barring extradition under the Article. To activate that provision the charges upon which a fugitive has been "punished" in the United States not only must cover the same acts as those which are the subject of the extradition request but must also have been the subject of formal charges (upon which the defendant was "tried") before the "punishing" court. As there can be no contention that the defendant here was "tried" in any New York court for the extraditable offense, his claim must fail.

### III.

■ Appellant also claims that the admission of evidence obtained in Canada tainted his extradition hearing. Stowe asserts that had the interceptions of telephone conversations, made in Canada by Canadian officials and admittedly lawful under Canadian law,[8] occurred in the United States or been performed by United States officials, such interceptions would have violated the Fourth Amendment and Title III of the Omnibus Crime Control Act of 1968, 18 U.S.C. § 2510 *et seq.*[9] He fur-

---

**7.** Since the events which are the subject of the Canadian charges in the instant case all occurred subsequent to March 22, 1976 (the effective date of the Treaty), it is not disputed here that the current Treaty is the governing extradition agreement.

**8.** Authorization for the interceptions was obtained under Canadian law pursuant to the Protection of Privacy Act (now Part IV.1 of the Criminal Code), Can.Rev.Stat. c. C–34, as amended (1970). Stowe does not here contend

that these interceptions were unlawful under Canadian law or that the procedures for the obtaining of authorization therefor were improperly observed.

**9.** Stowe bases his argument on the fact that Canadian law does not require that authorization for phone interceptions be based on a determination of probable cause that a crime was, is being or is about to be committed or with the additional protections of particularity, notice, time limitations, minimization, sealing,

ther claims that, since the Canadian investigation which uncovered the evidence upon which Stowe's Canadian arrest was based was "joined at the critical stage by" and "received the cooperation of" agents of the United States Drug Enforcement Administration and officers of the New York State Police, the evidence should have been excluded at his extradition hearing. While it is not disputed that the case which led to Stowe's arrest in Canada was developed primarily through information developed from the intercepted phone conversations,[10] this argument is not supported by existing law.

■ Appellant's reliance on the Omnibus Crime Control Act of 1968 is misplaced. Unless a contrary intent appears, federal statutes apply only within the territorial jurisdiction of the United States. *United States v. Cotroni*, 527 F.2d 708, 711 (2d Cir. 1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976). The Second Circuit has held specifically that the federal statute governing wiretapping and eavesdropping, 18 U.S.C. § 2510, *et seq.*, has no application outside the United States. *United States v. Toscanino*, 500 F.2d 267, 279 (2d Cir. 1974).[11]

■ Nor does appellant's constitutional claim bear close scrutiny. As a starting point, the Fourth Amendment exclusionary rule does not apply to arrests and searches made by foreign authorities on their home territory and in the enforcement of foreign law, even if the persons arrested and from whom the evidence is seized are American citizens.[12] *United States v. Morrow*, 537 F.2d 120, 139 (5th Cir. 1976); *Stonehill v. United States*, 405 F.2d 738, 743 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969). The rationale underlying this limitation is the doubtful deterrent effect on foreign policy practices that will follow from a punitive exclusion of the evidence in question by an American court.[13] However, if the circumstances of the foreign search and seizure are so extreme that they "shock the judicial conscience", a federal court in the exercise of its supervisory powers can require exclusion of the evidence so seized. *United States v. Morrow, supra*, 537 F.2d at 139; *United States v. Cotroni, supra*, 527 F.2d at 712 n.10; *Birdsell v. United States*, 346 F.2d 775, 782 n.10 (5th Cir.), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965); *see United States v. Nagelberg*, 434 F.2d 585, 587 n.1 (2d Cir. 1970), *cert. denied*,

---

etc., as provided for under the provisions of Title III of the Omnibus Crime Control Act of 1968, 18 U.S.C. § 2510 *et seq.*

10. Appellant's fingerprints were also found upon bags and newspaper in which the hashish which was the subject of the Canadian charges was contained at the time of its seizure in Canada. Admittedly, however, the package containing the hashish was seized in the course of an arrest which was the direct result of the interception of the telephone conversations. *See* App. 9–10.

11. Despite appellant's contentions to the contrary, the principle advanced in *Cotroni* and *Toscanino* does not depend upon the citizenship of the person whose telephone was tapped. *See United States v. Morrow*, 537 F.2d 120, 139 (2d Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *Birdsell v. United States*, 346 F.2d 775, 782 (5th Cir.), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1975).

12. That Stowe was in the United States when his calls were intercepted does not change the result here. The law of the locality in which

the tap exists (and where the interception takes place) governs its validity, even though the intercepted phone conversations traveled in part over the United States communication system. *United States v. Cotroni, supra*, 527 F.2d at 711.

13. *United States v. Morrow, supra*, 537 F.2d at 139. Stowe argues that exclusion would deter further Canadian intrusions upon the privacy of American citizens. However, the exclusionary rule, as a deterrent sanction, is not applicable where a private party or a foreign government commits the offending act. *United States v. Janis*, 428 U.S. 433, 455–56 n.31, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976). Rather, the exclusionary rule is intended to inculcate a respect for the police of our own nation. *United States v. Cotroni, supra*, 527 F.2d at 713. Since it has little if any deterrent effect upon foreign police, *see United States v. Welch*, 455 F.2d 211, 213 (2d Cir. 1972), it is seldom used to bar their work product. *United States v. Cotroni, supra*, 527 F.2d 713.

**342**

401 U.S. 939, 91 S.Ct. 935, 28 L.Ed.2d 219 (1971). The circumstances in the instant case do not fall within this exception.

There could be no contention here that the Canadian authorities did not scrupulously follow their own prescribed procedures, or that their conduct could in any way shock the conscience of the court. There exists no case, so far as we are aware, which suppresses evidence obtained in a foreign country under such conditions, regardless of whether the foreign officers failed to follow American constitutional procedures or of the extent to which American agents may have been involved in their activities. The courts can hardly be said to have spoken with one voice in articulating the reasons for their decisions,[14] but as a statistical matter they have apparently been unanimous in rejecting attempts to suppress the challenged foreign evidence.

The defendant's remaining claims are, under the law and facts of this case, also without merit. The judgment of the District Court is accordingly affirmed.

---

14. *See United States v. Morrow, supra,* 537 F.2d at 139; *United States v. Cotroni, supra,* 527 F.2d at 712; *United States v. Toscanino,* 500 F.2d 267, 280 n.9 (2d Cir. 1974); *Stonehill v. United States, supra,* 405 F.2d at 743; and *Birdsell v. United States, supra,* 346 F.2d at 782.